Nan PENDRELL, Plaintiff

v.

CHATHAM COLLEGE, Pittsburgh, Pennsylvania, et al., Defendants.

Civ. A. No. 71–1160.

United States District Court,
W. D. Pennsylvania.

Jan. 23, 1974.

As Amended Feb. 7, 1974.

James H. Logan, Samuel A. Vitaro, Hymen Schlesinger, Pittsburgh, Pa., for plaintiff.

H. Woodruff Turner, Thomas R. Johnson, Kirkpatrick, Lockhart, Johnson & Hutchison, Robert E. Wayman, Allen T. Lane, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., amicus curiae for plaintiff.

Stanley M. Stein, Sheldon H. Nahmod, Pittsburgh, Pa., for defendants.

OPINION

TEITELBAUM, District Judge.

Nan Pendrell, the plaintiff in this action, is a former Associate Professor of Anthropology at Chatham College in Pittsburgh. At the end of the 1971–72 academic year, her employment contract

with the college was not renewed. She thereupon filed suit under 42 U.S.C. § 1983[1] and § 1985(3)[2] against Chatham College, its president and provost, its Board of Trustees and the Board's chairman, and the chairman of the faculty committee on promotion and tenure. Her complaint alleges that she has been discriminated against on the basis of her age and sex.

Nan Pendrell had begun her academic career in 1957 at the age of 52. By 1961 she had graduated magna cum laude from Columbia University and had received a Ph.D. from that same institution in 1968. In the spring of 1968, a few months short of her 64th birthday, plaintiff accepted a teaching position at defendant Chatham College, and in September of that year assumed her teaching duties at the college.

Fourteen months later, in November of 1969, she became 65 years of age. Thus, nearly from the outset, her employment with Chatham was governed by the following provision in the faculty manual:

> "Under rare and unusual circumstances and at the discretion and on the initiative of the College, appointment of a member of the faculty or of an administrative officer may be extended beyond the normal retirement age on an annual basis."

In February of 1971, plaintiff received from defendant Eddy, the president of the college, a letter of employment stating that the academic year 1971–1972 would be her final year of appointment on the faculty of Chatham. No reason was given in that writing for the termination of her employment. Plaintiff signed the letter of employment accepting the aforesaid condition, but filed the within civil action alleging that she had been deprived of certain of her constitutional rights.

Plaintiff alleges that she has been deprived of due process in that she was denied a hearing by defendants on the reasons for the nonrenewal of her employment. She alleges that she has been denied equal protection of the laws in that at least one male faculty member who is older than plaintiff has been retained by the college. In addition, her complaint alleges that her First Amendment rights have been abridged insofar as her dismissal was due to her "academic and extracurricular involvement in the struggle[s] of black people [and women] for liberation, for basic equality and freedom from oppression."

The suit is before the Court on defendants' motion to dismiss. In sum, defendants contend that this Court lacks jurisdiction over the subject matter of this suit, that is, that plaintiff has failed to state a claim for relief under either Section 1985(3) or Section 1983. It is defendants' contention that plaintiff cannot demonstrate the existence of the requisite element of state action as to her Section 1983 claim and cannot

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

show that a conspiracy existed as to her claim under Section 1985(3).[3]

On July 5 and 6, 1973, in accordance with Braden v. University of Pittsburgh, 343 F.Supp. 836 (W.D.Pa.1972), rev'd 477 F.2d 1 (3d Cir. 1973), an evidentiary hearing was held to determine whether plaintiff stated a cause of action under either of the relevant sections of the Civil Rights Act. On the basis of the evidence, the depositions and testimony presented at that hearing, and in accordance with the reasoning and case law set forth below, it is held that plaintiff has stated a claim upon which relief may be granted as to Section 1985(3) only. Defendant's motion to dismiss will be denied as to plaintiff's Section 1985(3) cause of action and granted as to the action brought under Section 1983.

■ The two elements which must be demonstrated in order to state a cause of action under 42 U.S.C. § 1983 are: (1) the deprivation of a constitutionally guaranteed right, (2) by a defendant who acted under color of state law. The state action requirement will be discussed first.

## STATE ACTION

■ We start from the premise that "conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). But, as stated in Moose Lodge v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972):

> "While the principle is easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to 'State action,' on the other hand, frequently admits of no easy answer."

It is "only by sifting facts and weighing circumstances [that] the nonobvious involvement of the State in private conduct can be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

In practical application, the vague generalities of the *Burton* test have been formulated into five different approaches to the problem of determining whether state action exists in fact situations where the allegedly discriminatory acts were committed by persons who were not clearly employees or agents of government bodies. The first approach entails the itemization and tallying of contacts, primarily financial and regulatory, between the entity under examination and state and municipal authorities. If the number of contacts meets or exceeds a certain standard (which is rarely, if ever, defined), then state action is said to exist. The foremost example of this sort of judicial approach is Burton v. Wilmington Parking Authority, *supra*, wherein the operation of a restaurant by a private lessee within a publicly owned and financed parking garage building was held to constitute state action when the restaurant refused to serve a black customer. The Supreme Court listed the interconnections between the restaurant and the state and concluded:

> "*Addition of all these activities*, obligations and responsibilities of the Authority . . . indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." (Emphasis added). *Id.* at 724, 81 S. Ct. at 861.

The difficulty in applying this sort of approach, of course, is that its fundamental nexus, the point at which some state involvement becomes too much, is never spelled out. A Court which knows only that the state involvement must be

---

3. Plaintiff makes no contention that a claim can be stated under subdivision (1) and (2) of Section 1985.

"significant", as stated in Reitman v. Mulkey, 387 U.S. 369, 375, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), is left without a standard to apply in determining state action.

A variation on the contact counting approach is the attempt to find some "mutuality of benefit" [4] or "symbiotic relationship" [5] between the state and the discriminating entity. In reality, these two phrases usually identify the contact counting approach, either alone or combined with an interest analysis.

The second approach to a determination of whether state action exists in a particular fact situation involves an attempt to ascertain and balance the constitutional interests involved. The Supreme Court first referred to a balancing of interests test in a state action determination in Marsh v. Alabama, 326 U.S. 501, 508, 66 S.Ct. 276, 90 L.Ed. 265 (1946), wherein property rights were balanced against the freedoms of press and religion, but some evidence of interest balancing can probably be found in almost every state action adjudication.[6]

The interests involved are, of course, by their very nature, unquantifiable and almost always impossible to equate.[7] It is difficult, for instance, and not particularly helpful to gauge the relative importance of one group's freedom against another group's right to equality. The balancing of interests approach, dealing as it does with ethereal concepts, applies so nebulous a standard as to be unworkable.

The third approach to a determination of state action involves the use of the public function theory of state action.

This theory was first applied by the Supreme Court in Marsh v. Alabama, *supra*, the company town case, wherein it was held that since an ordinary municipality could not have barred Jehovah's Witnesses from distributing literature on city streets, the result could be no different where the town was in fact owned by a shipbuilding company. The public function theory—that state action exists where a private entity performs what would ordinarily be a municipal, governmental function—has also been applied by the Supreme Court to strike down discrimination where the issues were the conduct of elections for public office, Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and the maintenance of public parks, Evans v. Newton, *supra*.

In *Marsh*, *Terry* and *Evans*, the public function theory of state action is applied to activities which have long been the exclusive province of state or municipal government. In this case, the Court is urged to extend application of the theory to higher education, a function which, it is said, if it were not performed by private organizations, would be taken over by the state. The Court is not willing to undertake such an extension. There are few institutionalized activities which touch upon the public welfare which the modern state would not, or even has not taken over somewhere in the absence of private operation. Without an appropriate standard which would enable us to distinguish between those activities which constitute state action and those which do not, the Court would be proceeding blindly and arbitrarily in making a decision.[8]

---

4. Burton v. Wilmington Parking Authority, 365 U.S. at 724, 81 S.Ct. 856, 6 L.Ed.2d 45.

5. Moose Lodge v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

6. See Jackson v. Metropolitan Edison Co., 483 F.2d 754, 759 (3d Cir. 1973), for an example of the competing constitutional rights analysis.

7. For further criticism of the balancing of interests approach, see Haber, Notes on the Limits of Shelley v. Kraemer, 18 Rutgers L.

Rev. 811, 824–25 (1964) and Van Alstyne and Karst, State Action, 14 Stan.L.Rev. 3, 44–45 (1961).

8. The Court distinguishes on their facts and rejects on the basis of their inapposite reasoning Belk v. Chancellor of Washington University, 336 F.Supp. 45, 48–49 (E.D.Mo. 1970) and Guillory v. Administrators of Tulane University, 203 F.Supp. 855, 859 (E.D. La.1962), two cases in which it was held that higher education is a public function.

The fourth approach to a determination of whether state action exists is drawn from Justice Rehnquist's majority opinion in Moose Lodge v. Irvis, *supra*. This approach posits that state action can only be found to exist where the contact with state regulation is found, not just anywhere in the private organization's generalized activities, but in that very activity which is allegedly discriminatory. For instance, in *Moose Lodge* no state action is found because state licensing does not touch upon a fraternal organization's freedom to choose its patrons. In Jackson v. Metropolitan Edison Co., 483 F.2d 754 (3d Cir. 1973), no state action is found because state regulation of public utilities does not touch upon the utility's discretionary ability to shut off service to non-paying customers.[9]

## IMPORTANCE OF AN APPROPRIATE STANDARD

Predictability of decision-making, within the bounds of individual circumstance, must continue to be the essential purpose of the federal judiciary if the rule of law, rather than the rule of men, is to be maintained as the fundamental tenet of our system of government. In the absence of an appropriate judicial standard to be applied in a given factual situation, judicial decisions become the-product of an individual judge's personal bias or largesse. It is far too easy to start from the desired conclusion (the restriction of the seemingly expanding state action concept, for instance) and rationalize one's way a posteriori to the desired result. The preferable effort, in terms of judicial objectivity, would be to devise a fair and practical standard to be applied in state action determinations, with any resultant expansion or contraction of the state action concept to follow as it may.

█ ▪ Towards that end, a fifth approach to state action determinations is suggested. In line with the traditional principles of agency law, state action should be determined on the basis of the extent of governmental control or right to control, whether exercised or not, over the actions of the defendant. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), where uniformed police officers committed an assault on black persons, state action is clear because the police officers' real and apparent authority as agents of the state was obvious. Likewise, in less clear instances, those elements of financing and regulation which might give rise to governmental control must be examined in the light of accepted principles of agency law to determine whether actual or potential governmental control over the nominally private defendant's manner and means of doing things is present.[10] Under this control standard state *ex officio* membership on policy-making bodies and state veto power over institutional decisions might be important factors.

As a policy matter, in view of the overriding federal interest in guaranteeing constitutional rights, it would seem that close cases should be resolved in favor of finding governmental control and state action. But the instant case fails to present even that hypothetical close question. Applying the control test to the facts in the case *sub judice,* it is clear that Nan Pendrell's Section 1983 claim must fail. Although she has demonstrated numerous contacts between various governmental bodies and Chatham College, she has failed to demonstrate that the Commonwealth, or any

---

9. Both cases can also be analyzed from the point of view of the plaintiff's interest. That is, it might be said of *Jackson* that there is no right under the Constitution or laws of the United States to receive electricity, and of *Moose Lodge* that there is no right to be served food or drink in a private fraternal organization.

10. This standard is not original with this Court, except perhaps in its formulation, for its origin lies in Justice Harlan's eloquent dissent in the Civil Rights Cases, 109 U.S. 3, 43–52, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

government agency, exerts or has the power to exert meaningful control over the substantive decision-making which makes up Chatham's day-to-day operations.

Plaintiff has shown the following interconnections between Chatham College and various governmental branches:

(1) The Commonwealth of Pennsylvania has chartered Chatham College as a non-profit educational corporation under 15 P.S. § 7312.

(2) Chatham has been granted exemptions from both state and local taxation by virtue of its status as a non-profit educational corporation.

(3) Chatham is subject to certain state regulation of its operation. Its Education Department (which contains about 10% of the school's approximately 625 students) must have its courses certified for content by the state. The teachers which the . school graduates must themselves be certified by the state and in the course of their training use the Pittsburgh and Allegheny County public schools for their required student teaching.

(4) In 1969, Chatham was granted a zoning variance by Pittsburgh Ordinance No. 701 (1969) to permit the construction of a library and lecture hall in an area zoned for multiple family residency.

(5) The Commonwealth channelled $111,922.00 in student loans and scholarship aid to Chatham students in 1971–72.

(6) Chatham was granted approximately $720,000.00 of the five million dollar construction cost of the Jenny King Mellon Library Complex by the federal government under the Federal Higher Education Facilities Act, 20 U. S.C. §§ 701–721.[11]

The above listing of government/college interconnections should go to demonstrate the inefficacy of the contract counting approach to a state action determination. A superficial examination of the list might lead one to conclude that state action exists simply because of the number of interconnections involved. But when the more exacting control standard is applied, it can readily be seen that state action cannot be found as to Chatham College. Nowhere has it been demonstrated that any governmental body, state or local, has any input whatsoever, let alone control, as to any of Chatham's policy-making groups or as to any of Chatham's ministerial administrative functions.

Under the facts in this case, the result would be no different were the Court to apply any of the four approaches discussed above. The interest balancing approach, while perhaps of some utility in a final adjudication on the merits, is inappropriate at this stage of the proceedings because defendants' motion to dismiss challenges only the sufficiency of plaintiff's complaint. Application of the public function theory has been rejected for the reasons stated above.

If the contact counting approach were to be used, state action would not be found because an insufficient number of government/college contacts have been shown. Nor is state action demonstrable here if the *Moose Lodge* test requiring state contact which touches directly upon the allegedly discriminatory activity is applied. None of the interconnections listed above go, even in a remote sense, to Chatham's employment policy-making decisions.

The control standard suggested by the Court is designed to state with specificity what it is a court should be looking for in making a determination as to whether state action exists in a particular fact situation. This Court has chosen to apply the control standard and in so doing finds that no actual or potential governmental control over Chatham's operations exists.

---

11. Under the doctrine of Simkins v. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), the granting of federal funds can constitute state action if the money is chan-

nelled through a state commission pursuant to a state plan. The Court makes no finding as to whether such was the case in this instance.

■ Thus, the Court finds that no state action exists as to Chatham College. Chatham College is not an agency of that state and the actions of its trustees, officers and faculty cannot be found to have been taken under color of state law. Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

Since it has been held that no state action can be said to exist as to defendants' activities, it is unnecessary to deal at great length with the second part of an analysis under Section 1983—the determination as to whether a constitutional right has been alleged to have been violated. As to plaintiff's contention that she has been denied her constitutional right to due process, see Board of Regents v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972) for the standard to be applied. Plaintiff also contends that she has been denied her right to equal protection of the laws under the Fourteenth Amendment. We are cited to the recent decision of Frontiero v. Richardson, 411 U.S. 677, 93 S. Ct. 1764, 36 L.Ed.2d 583 (1973), as support for the proposition that "Classifications based upon sex, like classifications based upon race, alienage, and national origin, are inherently suspect and must therefore be subjected to strict judicial scrutiny." *Id.* at 688, 93 S.Ct. at 1768. The importance of this statement is that, were it to be accepted as controlling, it would require the stringent standard of "strict judicial scrutiny", rather than the more lenient "rational basis" standard to be applied whenever discrimination based upon sex was alleged. The problem is that the above quotation cannot be taken to stand as unequivocal support for that proposition. This is so because the quotation above, taken from Justice White's Opinion in the case, represents the views of only four Justices, not the view of a majority of the Supreme Court. Nevertheless, if Frontiero v. Richardson, *supra* does not stand unequivocally for the proposition that sex is now an inherently suspect criteria, it is at least an invitation to the lower federal courts to so rule. To

date, at least one federal court has done so explicitly. Wiesenfeld v. Secretary of HEW, 367 F.Supp. 981 (D.N.J.1973) (three-judge court). It is unnecessary to rule on the point in this case and the Court expresses no opinion on the subject.

### 42 U.S.C. § 1985(3)

■ Griffin v. Breckenridge, 403 U. S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed. 2d 338 (1971) sets out the elements of a cause of action under Section 1985(3).

"We return to the petitioners' complaint to determine whether it states a cause of action under § 1985(3) as so construed. To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'"

*Griffin* also holds that no finding that action has been taken under color of state law is necessary to state a cause of action under Section 1985(3).

Plaintiff Nan Pendrell has alleged each of the enumerated elements of a Section 1985(3) claim set out in the *Griffin* case. Her complaint clearly alleges that the "defendants, some or all of them, conspired and acted in concert pursuant to a common scheme . . .", thus satisfying element (1) of *Griffin*. The final two elements of *Griffin* are also clearly satisfied. Defendants' refusal to continue plaintiff's employment constitutes an "act in furtherance of the object of [the] conspiracy" in satisfaction of element (3). Her allegations of damage to her professional reputation and of

emotional and physical illness suffered as a result of defendants' actions satisfy the element of injury to person or property, as per (4) of *Griffin*.

Element (2) of Griffin v. Breckenridge, *supra* is also satisfied. In explaining element (2), Justice Stewart, writing for a unanimous Court, stated:

"The language requiring intent to deprive of *equal* protection, or *equal* privileges or immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Id*. at 102, 91 S.Ct. at 1798. (Emphasis in the original).[12]

In Richardson v. Miller, 446 F.2d 1247 (3d Cir. 1971), the Third Circuit Court of Appeals concluded that plaintiff's complaint stated a cause of action under Section 1985(3) when it alleged that plaintiff was discharged from his employment because he (1) expressed views criticizing and opposing what he believed to be racially discriminatory employment practices, (2) advocated the election of federal candidates most likely to eradicate unequal employment opportunities, and (3) advocated, in general, racial equality in employment opportunities. Although Richardson himself was not a member of the class discriminated against, the Court concluded that "in light of the trend in recent decisions to 'accord [the civil rights statutes] a sweep as broad as their language,'" plaintiff's complaint was sufficient to constitute the "racial, or perhaps otherwise class-based invidiously discriminatory animus" required by *Griffin*.

Thus, plaintiff has satisfied element (2) of *Griffin* twice over. Insofar as she alleges that she was discriminated against for her advocacy of women's rights, she has satisfied the class-based animus requirement as to a class of which she is a member. Insofar as she alleges that she was discriminated against for her advocacy of the rights of blacks, she has satisfied the requirement as to a class of which she is not a member. The *Richardson* case requires this Court to accept this second factor in satisfaction of element (2) of *Griffin*. Plaintiff has therefore stated a cause of action under 42 U.S.C. § 1985(3).

The foregoing Opinion shall constitute findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a).

---

12. Thus, an "invidiously discriminatory animus" rather than specific intent to discriminate is the mental state which must be proven under Section 1985(3).